OPINION
{¶ 1} Defendant-appellant, Heather Peters, appeals her conviction in the Belmont County Court, Western Division for cruelty to an animal following a bench trial.
 {¶ 2} On or about July 16, 2001, Verna Painter, a volunteer for the Belmont County Animal Shelter, received a call notifying her of an animal that was in possible distress. As a result of the call Ms. Painter, along with Cheryl Demetrakis, the vice president of the Belmont County Animal Rescue League, went to the home of the allegedly distressed animal to see if a valid complaint existed. There they found an emaciated dog lying on his side with his head down. The two women received permission from appellant, the dog's owner, to take the dog, Noah, with them. They took Noah to Animal Urgent Care where the veterinarian determined that Noah had end-stage heartworm disease and was near death. Therefore, the veterinarian euthanized Noah.
 {¶ 3} As a result, on July 23, 2001, an abuse officer from the Belmont County Animal Rescue League filed a complaint against appellant alleging that she abused Noah in violation of R.C. 959.13(A)(1), a second-degree misdemeanor. Appellant proceeded to a bench trial on October 9, 2001. The trial court found appellant guilty. It sentenced appellant to 90 days in jail, 60 days suspended; ordered her to pay a $250.00 fine; ordered that she pay restitution in the amount of $101.00; and placed her on supervised probation for two years. Appellant filed her timely notice of appeal on October 29, 2001. The trial court granted appellant a stay of execution pending this appeal.
 {¶ 4} Appellant raises one assignment of error, which states:
 {¶ 5} "DEFENDANT-APPELLANT'S GUILTY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW."
 {¶ 6} Appellant argues that the evidence presented at trial does not support her conviction. She points out that Dr. Mike Sparling, the veterinarian who treated Noah, testified dogs that live in areas infested with heartworms should be on heartworm prevention medication. Appellant contends she was not aware that her geographic area was infested with heartworms; thus, her failure to give Noah heartworm prevention medication was not unreasonable. Appellant also notes she testified that she gave Noah an over-the-counter worm medication. She further notes that Dr. Sparling testified that it is a common misconception among lay people to think that an over-the-counter worm medication can help a heartworm problem. Finally, appellant calls our attention to her testimony that Noah always lost weight in the summer and regained the weight in the fall.
 {¶ 7} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 8} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 9} Appellant was convicted of violating R.C. 959.13(A)(1). This statute provides:
 {¶ 10} "(A) No person shall:
 {¶ 11} "(1) Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water." R.C. 959.13(A)(1).
 {¶ 12} In order to sustain a conviction under R.C. 959.13(A), the State must prove, beyond a reasonable doubt, the appellant acted recklessly. State v. Dresbach (1997), 122 Ohio App.3d 647, 652. R.C.2901.22(C) defines the term "recklessly" as follows:
 {¶ 13} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." Id.
 {¶ 14} The trial court found that appellant tortured Noah. The trial court, utilizing the reasoning of Dresbach, supra, applied the definition of "torture," found in R.C. 1717.01. R.C. 1717.01
provides in pertinent part:
 {¶ 15} "As used in sections 1717.01 to 1717.14, inclusive, of the Revised Code, and in every law relating to animals:
 {¶ 16} "* * *
 {¶ 17} "(B) `Cruelty,' `torment,' and `torture' include every act, omission, or neglect by which unnecessary or unjustifiable pain or suffering is caused, permitted, or allowed to continue, when there is a reasonable remedy or relief."
 {¶ 18} The Dresbach court also found the definition of torture, as set forth in R.C. 1717.01(B), "is broad enough to include situations where an animal suffers needlessly because of the owner's failure to seek critically necessary veterinary care, if such care represents a reasonable remedy." Id. at 651. Therefore, in order to sustain the conviction, the evidence must support a finding that appellant acted with heedless indifference or disregarded a known risk which resulted in Noah suffering unnecessarily when a reasonable remedy was available.
 {¶ 19} The parties elicited the following testimony at trial.
 {¶ 20} Ms. Painter, one of the first women to see Noah, testified she learned of Noah when she received a call about an animal that was in possible distress. (Tr. 8). Ms. Painter called Ms. Demetrakis to accompany her to investigate the complaint. (Tr. 9). The two traveled to Flushing Township in Belmont County, Ohio where they found Noah. (Tr. 9). They also spoke with appellant, Noah's owner. (Tr. 9). When asked to describe Noah's condition Ms. Painter explained, "Very, very thin. Emaciated. Laying at the end of his chain on his side, all four legs out and his head was down." (Tr. 10). Ms. Painter testified that Noah was not able to stand up and she had to carry him to her vehicle. (Tr. 11). Ms. Painter testified that she has been involved with the Animal Rescue League for approximately 28 years. (Tr. 12). She stated that Noah's health appeared to be "horrible." (Tr. 12). Ms. Painter stated she had never seen a worse case of a dog suffering from heartworm infection during her entire time working in the field. (Tr. 12). She stated she heard appellant state that she did not have the money to get Noah medical care. (Tr. 12). She opined that by the time she saw Noah, his disease was so advanced that he would have to be euthanized. (Tr. 12-13). Ms. Painter further testified that the cost of euthanizing a dog at the animal shelter was $3.50. (Tr. 13). When asked whether in her opinion appellant had intentionally harmed Noah, Ms. Painter stated that she believed appellant acted recklessly, irresponsibly, should have known better and did not care about Noah. (Tr. 15-16). Ms. Painter additionally testified about heartworm disease. She stated that the signs that indicate a dog is infected with the disease include a chronic cough, lethargy and listlessness. (Tr. 16).
 {¶ 21} Next, Ms. Demetrakis testified. Ms. Demetrakis stated that when they arrived at appellant's house she asked appellant about Noah's condition. (Tr. 22). Appellant informed Ms. Demetrakis that Noah had been sick for about a month and had been losing weight. (Tr. 22). She told Ms. Demetrakis she had given Noah over-the-counter worm pills. (Tr. 22). She also told Ms. Demetrakis she had checked into euthanizing Noah, but it was cost prohibitive. (Tr. 23). Ms. Demetrakis next testified about Noah's condition. She stated that when she saw Noah, he appeared to be in the process of dying. (Tr. 23). She testified that Noah was lying on the ground, made no effort to stand, was having difficulty breathing and his gums were yellow from jaundice. (Tr. 23-24). When asked if Noah appeared to be in any pain, Ms. Demetrakis stated that when they tried to slide him onto a blanket to move him, he screamed. (Tr. 24). Ms. Demetrakis, who had been with the Animal Rescue League for 30 years, opined the humane thing to do for Noah was to take him to a veterinarian who could evaluate the situation and then have him euthanized. (Tr. 24). She characterized appellant's lack of care for Noah as grossly neglectful. (Tr. 25). Ms. Demetrakis opined that Noah's condition had to have been deteriorating for several weeks to reach the point where she found him. (Tr. 27-28). She testified that the treatment for heartworms is a diagnostic blood test followed by medication. (Tr. 29). She also testified the animal shelter informs people who call that if their animal is sick, the shelter will pay for a veterinarian's visit. (Tr. 30).
 {¶ 22} Dr. Sparling, the veterinarian from Animal Urgent Care, testified next. Dr. Sparling stated that he examined Noah and noted Noah was considerably thin, with all ribs as well as all bony protuberances of the pelvis and spine visible. (Tr. 32). Dr. Sparling testified Noah was weak and unable to stand, which was due to a low paxil and blood count and a heart problem. (Tr. 32-33). He also stated Noah had a jugular pulse present, which indicated regular heart failure; a wholly systolic murmur; weak pulse; and jaundice. (Tr. 33). When asked about the appearance of Noah's coat and ears, Dr. Sparling testified that the other conditions he mentioned were so life threatening that he did not concern himself with anything else. (Tr. 33). Dr. Sparling testified Noah had the frame of a 50-pound dog; however, he only weighed 37.5 pounds. (Tr. 33). Dr. Sparling stated Noah was near death. (Tr. 33). He also stated that Noah was semi-comatose, so he did not appear to be feeling pain. (Tr. 34). Dr. Sparling testified that Noah had end-stage heartworm disease. (Tr. 34). Dr. Sparling stated Noah became very weak because his heart was not working properly; however, he did not think Noah was in agonizing pain. (Tr. 35). Dr. Sparling testified that Noah should have been on heartworm prevention. (Tr. 46). Given his condition, he also opined that appellant should have had Noah euthanized. (Tr. 46).
 {¶ 23} Additionally, Dr. Sparling testified dogs are usually tested once a year to check for heartworms. (Tr. 34). He stated that once the animal's symptoms become clinically apparent, it is already on a slippery slope. (Tr. 34). Dr. Sparling testified that there exists a common misconception among lay people that an over-the-counter worm medication will treat heartworms. (Tr. 35-36). When asked about what type of care appellant should have provided Noah, Dr. Sparling testified Noah should have been on heartworm prevention, either in the form of a monthly pill or a semi-annual shot. (Tr. 36). He also testified when a dog is first presented with heartworms, his normal course of treatment would be to run some tests and then give the dog a drug to kill the heartworms. (Tr. 37). He further stated that in his professional opinion a dog in Noah's condition needed to be euthanized. (Tr. 38). Dr. Sparling testified that once the dog begins to lose weight, it has about a 50/50 survival rate if treated; if left untreated, heartworms are fatal. (Tr. 41). He also stated that the average cost to treat heartworms is approximately $300 to $500. (Tr. 41). Dr. Sparling testified that dogs with heartworms often feel as though they have a very bad flu. (Tr. 43).
 {¶ 24} Next, appellant testified in her own defense. Appellant testified that in the summer of 2001 she began to notice problems with Noah including weight loss and hair loss. (Tr. 51). She stated there were some days when he would not eat. (Tr. 51). Appellant stated that every summer Noah would lose some weight and then in the fall, he would gain it back. (Tr. 52). She attributed Noah's weight loss to heartworms. (Tr. 52). Appellant testified she attempted to treat Noah with pills, which she referred to as heartworm pills. (Tr. 53). She introduced the pill box into evidence. (Defendant's Exhibit A). Appellant admitted that when Ms. Painter and Ms. Demetrakis took Noah, he was unable to get up. (Tr. 55). She stated that she thought about euthanizing Noah but she thought he would perk back up in the fall. (Tr. 57).
 {¶ 25} On cross-examination, the State presented appellant with three photographs of Noah on his last day. (State's Exhibits 1, 2 and 3). She testified the photographs were accurate representations of how Noah looked that day. These photographs speak for themselves. They show Noah lying on his side. His ribs are noticeably visible through his coat as are other bony protrusions. His belly is sunken in and he appears listless. The State also asked appellant to point out where on the box of medication it stated the pills were for heartworms. (Tr. 60). Appellant admitted that nowhere did the box state that the pills were for heartworms. (Tr. 60). The box states that it is for the "removal of the large roundworm." (Defendant's Exhibit A). Additionally, the box reads in capital letters, "DO NOT WORM PUPPIES OR DOGS THAT ARE SICK, * * *. CONSULT YOUR VETERINARIAN FOR ASSISTANCE IN THE DIAGNOSIS, TREATMENT AND CONTROL OF PARASITISM." (Defendant's Exhibit A).
 {¶ 26} Appellant's husband, Stewart Peters, also testified in his wife's defense. He testified that Noah was unable to walk for about two days before the animal rescue people arrived. (Tr. 67). He also contradicted his wife's testimony stating that Noah did not have health problems every summer. (Tr. 69). When shown the pictures of Noah on cross-exam, Mr. Peters stated Noah did not normally look that way; he only appeared that way after he became ill. (Tr. 70). He testified Noah did not become ill and looked that way every summer. (Tr. 70).
 {¶ 27} Last to testify was appellant's father, Ronald Hickenbottom. Mr. Hickenbottom testified that Noah lost weight and did not eat and drink as much in the hot summer months. (Tr. 72). He stated that the summer of 2001 was not any different until about two weeks before the animal rescue people came for him. (Tr. 73). Mr. Hickenbottom testified that at this time Noah began having blood in his bowel movements and vomiting with blood in the vomit. (Tr. 73). He testified that he thought Noah was not going to survive so he offered to shoot him, but appellant refused. (Tr. 73).
 {¶ 28} It is clear from the evidence that appellant acted recklessly in failing to seek some sort of medical attention for Noah. Noah was clearly suffering during the weeks and days leading up to July 16. Appellant, her husband and her father all recognized that Noah was sick. Noah exhibited many symptoms including lethargy, weight loss, hair loss, blood in his stool and vomiting blood. Appellant's father even recognized that Noah was so sick that he should be euthanized, yet appellant failed to seek veterinary care for Noah. Apparently, Noah was in such a decrepit, feeble state that an anonymous person believed he was in serious enough danger to warrant a call to the Animal Rescue League.
 {¶ 29} Failing to seek veterinary care or even advice over the telephone from a veterinarian or animal care provider constituted "torture" as R.C. 1701.01(B) defines the term. It was an act by which unnecessary or unjustifiable pain or suffering was caused, permitted, or allowed to continue, when there was a reasonable remedy or relief. First, appellant should have taken Noah to a veterinarian at some point in his life. Had she done so, presumably Noah would have been given preventive heartworm medication. Appellant's father testified that he took Noah to a veterinarian once when he first got Noah, which would have been approximately four years earlier. There is no evidence appellant ever took Noah to a veterinarian since she owned him. Even if it was reasonable that appellant never took Noah to a veterinarian while he was healthy, after he became noticeably ill, she should have taken him to a veterinarian to seek diagnosis and treatment for his condition. Had she done so, Noah could have been tested positive for heartworms and proceeded with medication. Even if Noah presented with symptoms at a point where it was too late to save his life, appellant should have had Noah euthanized to end his suffering. The local animal shelter would have euthanized Noah for $3.50.
 {¶ 30} Animal cruelty does not consist solely of active cruelty, but also includes passive cruelty or neglect. State v. Myers (1993),87 Ohio App.3d 92, 96. Such is the case before us. Appellant's actions, or lack thereof, were unjustifiable. The decision not to seek treatment from a veterinarian, or the local animal shelter, was inexcusable given the condition Noah was in on July 16. Appellant may not have had the finances to provide Noah with the best veterinary care available. However, when she decided to own a dog she acquired certain responsibilities, one of which was to see to it that the dog did not suffer unnecessarily due to her heedless indifference for his health. Clearly, appellant's omissions and/or neglect caused Noah unnecessary or unjustifiable pain and/or suffering, which she allowed to continue, when there were several reasonable remedies she could have pursued. After a thorough review of the record, it is clear that the trial judge as finder of fact did not lose his way and cause a manifest miscarriage of justice. Accordingly, appellant's sole assignment of error is without merit.
 {¶ 31} For the reasons stated above, the decision of the trial court is hereby affirmed.
Waite, J., and DeGenaro, J., concur.